Filed 4/1/26  In re Destiny P. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re DESTINY P., a Person Coming Under Juvenile Court Law. | B346087 |
| | (Los Angeles County Super. Ct. No. 18CCJP05687) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| LINDSEY P., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Mary E. Kelly, Judge.  Affirmed.

Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Brigette Dutra, Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellant-father Lindsey P.[1] appeals from juvenile court orders sustaining a count brought against him under Welfare and Institutions Code section 300, subdivision (b)(1), in a petition filed by respondent Department of Children and Family Services (DCFS) on behalf of his daughter, Destiny P. (born February 2017) and removing Destiny from his custody.[2] The sustained count alleged Destiny was endangered by Father's inability to care for her because of his need for constant medical care and his residence at a facility providing 24-hour medical care.

On appeal, Father argues: (a) although Destiny's mother did not appeal the portions of the petition sustained against her, his appeal is justiciable; (b) substantial evidence does not support the court's sustention of the petition against him because he could arrange for someone else to care for Destiny; and (c) substantial evidence does not support the court's order removing Destiny from his custody for the same reason. DCFS counters that Father's appeal is moot and substantial evidence supports the court's orders. We reach the merits of Father's appeal and

_____

[1] Father's name appears as both "Lindsay" and "Lindsey" throughout the record. We use "Lindsey" because that is the spelling that appears on Destiny's birth certificate.

[2] Undesignated statutory references are to the Welfare and Institutions Code.

conclude substantial evidence supports the court's orders.  We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Prior Child Welfare History*

In September 2018, DCFS substantiated allegations that Mother had been smoking PCP in Destiny's presence and while driving with Destiny as a passenger, once getting into an accident.  In that investigation, Father "conceded . . . that he could not independently care for the child," and DCFS placed her in foster care.  In February 2019, a juvenile court sustained allegations that Mother had a history of illicit drug use, was a current abuser of PCP, and drove with Destiny in the car while under the influence of PCP.  Six months later, the court released Destiny to Mother and, six months after that, terminated jurisdiction with Mother receiving sole legal and physical custody; Father was granted a minimum of one "supervised" visit a week.  The court noted Father had not completed parenting classes or individual counseling.

In February 2021, DCFS substantiated an allegation of general neglect by Mother as to Destiny after Mother, who was high on PCP, drove her car into a fence while Destiny was a passenger.  Mother agreed to a temporary safety plan where a maternal uncle (MU) took custody of Destiny.

### B.    *DCFS Investigates a Referral*

On February 4, 2025, DCFS received a referral stating Mother had not picked Destiny up from her after-school program and was not responding to phone calls.  Law enforcement took

3

Destiny into protective custody.  The previous day when Mother arrived to pick up Destiny, she appeared intoxicated.

A children's social worker (CSW) spoke with an officer from the Los Angeles Police Department who reported that when other officers made contact with Mother at her home, she appeared "very intoxicated."  The officers asked Mother where Destiny was, and Mother responded she was at her after-school program until 6:00 p.m.  The officers asked Mother what time it currently was, and she responded that it was 8:00 p.m.  When the officers asked if she would be picking Destiny up from the program, she answered, "no."

The CSW spoke with Destiny, who was observed to be wearing dirty clothes.  She stated she lived with Mother, and that Father lived at the Veterans Affairs Hospital in Santa Monica because he was blind and very sick.  Destiny reported this was not the first time Mother failed to pick her up; when this happened previously, MU would pick her up.  Destiny asserted Mother's "drug use" was why Mother could not pick her up.  Destiny claimed Mother "gets high . . . every day"; when she does, she "cannot stand up, falls when she tries to walk and becomes very weird."  Destiny explained Mother would smoke a light-brown, liquid drug that came in a small container; the container was stored in an unlocked drawer that Destiny could access.  Destiny said she did not sleep well because she had to ensure Mother did not injure herself when high.  Additionally, Mother was unable to cook for Destiny (feeding her only pepperoni slices) and did not do laundry (forcing Destiny to wear dirty clothes).

Destiny also recounted that Mother left her home alone at night on a few occasions, left her alone at the park for a few hours, and left her alone at a pizza restaurant for over an hour.

4

Sometimes Mother would smoke her drug while walking on the street with Destiny, resulting in the pair walking for hours until Mother recognized where they were. Destiny said she did not want to live with Mother and wanted to live with MU.

The CSW spoke with the maternal grandmother (MGM) who confirmed Mother had a prior and current problem with PCP, claiming Mother would enroll in a drug rehabilitation program, remain sober for a few months, and then would return to using drugs again. MGM said MU would care for Destiny when Mother was in rehab, and he was "very involved in Destiny's life." The CSW also spoke with MU, who confirmed what MGM said. He stated he was not currently in a position to take Destiny but would find relatives who could.

The next day, the CSW spoke with a maternal aunt by marriage (MA), who also confirmed Mother's PCP use and MU's care for Destiny when Mother was in rehab.[3]

MU went to Mother's home and called the CSW so they could talk. MU reported Mother was "very much high" and "unable to compose herself enough to understand what is going on." Mother babbled and "repeated [the] CSW's words in a haunting manner but would not engage in conversation." Mother did not seem to understand Destiny was not physically present in her home. The CSW later received an "Info to CSW" that reported Mother had been staggering on the street earlier that day, falsely claiming she had dropped Destiny off at school that morning. Mother "smelled of alcohol and possibly had other substances."

---

[3] Although the record is not entirely clear, it does not appear that MA and MU were married or cohabiting during this time.

DCFS placed Destiny with MA.

### C.     *The Court Detains Destiny*

In February 2025, DCFS filed a petition under section 300, subdivision (b)(1).  Count b-1 alleged Mother did not pick Destiny up from school on multiple occasions, and on February 4 and 5, 2025, "was observed to be under the influence of substances and incoherent."  Count b-2 alleged Mother had a history and was a current abuser of substances, including PCP.  Count b-3 alleged Mother left Destiny home alone and in public places without adult supervision for an extended period of time.

The court found DCFS had made a prima facie case that Destiny was a person described by section 300 and detained her from Mother.

### D.     *DCFS Continues to Investigate*

A dependency investigator (DI) spoke with several witnesses.

#### 1.     Destiny

In late February 2025, the DI spoke with Destiny, who confirmed her previous statements about Mother's substance abuse, how the substance abuse required Destiny to take care of herself when Mother was under the influence (including preparing her own meals using an oven), and how Mother would sometimes leave her without adult supervision.

#### 2.     Mother

In March 2025, the DI spoke with Mother at her treatment facility.  Mother said she had participated in drug treatment "10 or 11 different times throughout her struggle with her addiction"

and this was the second time at this particular facility. Mother admitted to using PCP while pregnant with Destiny, but claimed "it was not as often, . . . maybe once a week." Mother said she dipped her cigarettes in PCP but said she also smoked regular cigarettes, which she claimed Destiny mistook as cigarettes dipped in PCP.

As to the incidents that occasioned the referral, Mother claimed both that: "I took my daughter to school and picked her up that day" and "The last time I took her to school, when I went to pick her up, she was not there." Mother did not remember speaking with either the police or her brother that night. Mother denied leaving Destiny alone at home for more than 30 minutes when she went to the store to buy something. Mother stated she did not remember leaving Destiny at a park but did remember leaving her at a pizza restaurant while she went to the store.

In mid-March, Mother informed the DI she was about to complete a month in her drug treatment program and was committed to staying sober for Destiny.

### 3. Father

On February 21, 2025, the DI spoke with a social worker at the VA Hospital who informed him that Father lived in the VA's nursing home. The social worker then found Father so the DI could speak with him.

Father agreed to cooperate with DCFS but cautioned he was "limited in his abilities as he is blind and in a nursing home." The DI told him that "DCFS will not discriminate on his disabilities if he is able to care for the child and meet her needs" and explained it could be possible for him to make an appropriate plan for Destiny's care.

7

Later that day, Father's social worker at the VA informed the DI that Father "has dementia and is limited in his mental abilities." Due to Father's mental state, the VA's office "has an agreement with [Father's] adult son where the adult son assists with [Father's] decision making." The social worker also mentioned that "during the previous DCFS involvement, [Father] was affected severely by the case causing him serious mental health concerns" and Father's "doctors are concerned that further conversations with [Father] regarding Destiny can result in possible mental health concerns for" Father. The social worker said she would try to reach out to Father's adult son to see if he would permit DCFS to speak more with Father.

On March 5, 2025, the social worker informed the DI that she had been able to speak with Father's adult son, M.P. After M.P. said he wanted to speak with the DI first, the social worker provided him with the DI's contact information. M.P. "assured" the social worker he would contact the DI.

On March 18, 2025, the social worker informed the DI that Father had "shown some signs of regression since being aware about DCFS involvement." When told that M.P. had yet to reach out to the DI, the social worker "expressed some frustration and stated that she has continued to make efforts to contact Mr. M[.]P[.] about DCFS involvement." The social worker said she lacked M.P.'s consent to give his contact information to the DI.

On March 21, 2025, M.P. called the DI, with Father also on the call. M.P. requested that both Father and he be permitted to visit Destiny. After the DI reported that DCFS had placed Destiny with MA, M.P. said he preferred Destiny to be in his care. The DI told him it would be possible for the court to order Destiny released to Father, with a plan that M.P. care for

8

Destiny. The DI asked M.P. about his living arrangements, and M.P. said he lived alone in a one-bedroom apartment, although he had a 10-year-old daughter who lived with M.P.'s mother. M.P. asked Father whether Father would agree for M.P. to care for Destiny if the court granted it, and Father said that "he would like him to care for Destiny."

Later that day, the DI received information that "an Adult Protective Services report was filed on behalf of" Father against M.P. "due to allegations of financial fraud." It was alleged that M.P. used Father's money "for his own personal use."[4]

### 4.    MA and MU

MA and MU both confirmed Mother had longstanding problems with PCP that were unresolved despite multiple stints in rehab and had previously failed to pick Destiny up from day care several times, resulting in MU picking her up.

### E.    *DCFS Amends the Petition*

A day before the initial adjudication hearing, DCFS filed an amended petition, adding count b-4, which alleged Father was "unable to provide the child with ongoing parental care, supervision, and the basic necessities of life including food, clothing, shelter and medical treatment" because he "requires constant medical care and resides in a facility with 24 hour medical care." The court ordered monitored visits for Father, three hours per visit, thrice weekly, and continued the adjudication hearing for a month.

---

[4] The record does not disclose who filed the report and/or made the fraud allegation.

9

On March 27, 2025, the DI met with Father. Originally, M.P. was to be part of the meeting but he cancelled his participation "due to an unexpected change in plans." Father stated that "he does not recall mother using drugs" but also that "he could sense that maybe she was using [by] the way that she talked." He added he did not "like what mother was doing" and "would talk to mother about those situations when they were going on." He did not know "it was that bad for Destiny." Father claimed Mother "knew he would become angry at her when she would use PCP." He was unaware that Mother left Destiny alone at home or in public places.

Father claimed Mother "has a debit card that has money allocated for her to purchase whatever Destiny needs." Father believed Mother received four thousand dollars a month—three thousand for Destiny and one thousand for Mother. Father said he knew Mother's card "has been blocked" and that he discovered Mother "was using it to buy other things, like drugs."

In a separate conversation, Father's social worker opined Father was "not a reliable source of information and struggles to provide accurate information due to his medical conditions." The social worker "stated that she has experience providing [Father] with basic information regarding his daily life and [Father] is unable to retain that information."

In early April 2025, the DI spoke with Mother about M.P. Mother stated Destiny did not know him and had not spent any time with him. She further claimed he was an active and affiliated gang member who had been in and out of prison. Mother confirmed she had a debit card through which Father provided money, but explained the card had been locked since Destiny's detention.

10

On April 9, 2025, the DI spoke with M.P. M.P. admitted he had been arrested in the past but claimed he had never spent more than a month in jail. He explained he was charged with making a criminal threat, but the charges were dropped. He denied being affiliated with any street gangs and asserted he was a hard-working individual with a 10-year-old daughter. M.P. said he was willing to care for Destiny if that is what Father wanted, and if he were given time to prepare. When the DI asked if M.P. would provide a written release to the VA so DCFS could gather more information about Father, M.P. said he would, if Father agreed, and that he would need to speak with Father first. Although he agreed to do so "within the next couple of days," the record contains no evidence of any further conversation between Father and M.P.

### F. *The Court Removes Destiny From Both Parents*

On April 30, 2025, the court held the adjudication and disposition hearings. Father's counsel asked the court to dismiss count b-4, arguing a "lack of evidence, [and a] lack of any nexus of protective issue." Counsel argued Father was unaware Mother was having issues and believed Destiny was doing fine. Counsel added that Father could "make arrangements" for M.P. to care for Destiny and, just as Father had been "financing" Destiny's care with Mother, he could do the same for M.P.

Mother's counsel requested the court dismiss count b-1 as redundant but otherwise admitted Mother had a substance abuse problem and that Destiny's statements to DCFS were true.

Destiny's counsel agreed with Mother's counsel that count b-1 was redundant but asked the court to sustain the remainder of the petition. Counsel expressed concern with the "appropriate plan" Father proposed, pointing out Father was "unable to make

11

decisions for himself" and that "all decisions are made by his adult son."

DCFS's counsel asked the court to sustain the entire petition. As to count b-4 involving Father, counsel noted M.P.'s criminal history and the open investigation into M.P. by Adult Protective Services. When the court asked DCFS's counsel to explain how Father's need for constant medical care and residence in a facility providing 24-hour medical care placed Destiny at substantial risk of harm, counsel responded it was Father's "inability to ensure that his child is going to receive the basic care," such as going to school or medical appointments. Counsel added that "the person he's proposing is not somebody that the Department has been able to establish can provide that level of care."

The court commented that the allegation in the petition was not that Father was unable to formulate an appropriate plan for Destiny's care. The court also concluded it was untrue that Father could not provide for Destiny's basic necessities, because he provided Mother money for those necessities. The court agreed Father could not provide Destiny with ongoing parental care or supervision. The court therefore modified count b-4 to read: Father "is unable to provide the child with ongoing parental care, and supervision. The father requires constant medical care and resides in a facility with 24 hour medical care. Such inability to provide for the child on the part of the child's father endangers the child's physical health, safety and wellbeing and places the child at risk of serious physical harm." The court also struck count b-1 and added to count b-2 an allegation that Mother was unaware Destiny had been detained the previous day

12

because she failed to pick her up.  With those modifications, the court sustained the petition.

The court then found "by clear and convincing evidence that there would be a substantial danger to the physical, health, safety and protection, and well-being of the child, if the child were returned home to" either parent, and that there were no reasonable means short of removal to protect her.  The court based its finding on "the facts . . . found true in the sustained petition."  The court also noted Father could not have custody of Destiny at the VA and that M.P. had not been responding to DCFS.  The court granted Father monitored visits thrice weekly but ordered DCFS to assess whether unmonitored visits would be appropriate.

Father timely appealed.

## DISCUSSION

### A.    *We Reach the Merits of Father's Appeal*

"[T]he principle that '[d]ependency jurisdiction attaches to a child, not to his or her parent' [citation], means that ' "[a]s long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate" ' [citation].  Thus, where jurisdictional findings have been made as to both parents but only one parent brings a challenge, the appeal may be rendered moot."  (*In re D.P.* (2023) 14 Cal.5th 266, 283.)

Although Mother did not appeal, Father argues his appeal is not moot because the orders being appealed "are impacting the current dependency proceedings."  Alternatively, he asks that if we find the appeal to be moot, we use our inherent discretion to review the jurisdictional findings because "[s]hould there be a

13

new referral," the court's sustention of the petition against Father would adversely affect him.

DCFS counters Mother's failure to appeal renders the appeal moot because, regardless of how we decide this appeal, "Destiny would remain a dependent of the juvenile court." DCFS also contends discretionary review is unwarranted here because, to the extent the court based its order to remove Destiny from Father on its sustention of the petition, the court could have removed Destiny from Father even without sustaining the petition. Further, "any argument concerning future prejudice based on the sustained count or consequences beyond jurisdiction is speculative."

"[A] case is not moot where a jurisdictional finding affects parental custody rights [citation], curtails a parent's contact with his or her child [citation], or 'has resulted in [dispositional] orders which continue to adversely affect' a parent." (*In re D.P.*, *supra*, 14 Cal.5th at pp. 277–278.) "Even when a case is moot, courts may exercise their 'inherent discretion' to reach the merits of the dispute." (*Id.* at p. 282.) "Courts may consider whether the challenged jurisdictional finding 'could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings,' or ' "could have other consequences for [the appellant], beyond jurisdiction." ' " (*Id.* at p. 285.)

Here, Father's appeal is not moot because the court ordered his visits with Destiny to be monitored. Although the court did not specify a reason for this restriction, immediately before making this order, it sustained an allegation that Father was unable to provide Destiny with ongoing parental care and supervision, which endangered Destiny and placed her at risk of serious physical harm. Given that no one alleges Father took any

14

affirmative actions that endangered Destiny, it is reasonable to conclude the court would have made a different visitation order (and perhaps even a different disposition order) had it not sustained the petition against Father.

Further, even were Father's appeal moot, we would exercise our discretion to reach the merits because the challenged jurisdictional finding is likely to impact future dependency proceedings. While DCFS contends such a potential prejudice is "speculative," DCFS itself has argued in this appeal that Father cannot claim he was protective of Destiny in 2018 "by reporting mother's PCP use to DCFS" because "[t]he record indicates that, even in 2018, father was not able to exercise care and control of Destiny." It takes little imagination to anticipate that, were yet another dependency case to be opened regarding Destiny several years from now alleging, in part, that Father could not provide Destiny with adequate care, DCFS would cite to the jurisdictional finding on appeal now as support for a court's finding of jurisdiction then.

### B.     *Substantial Evidence Supports the Court's Jurisdictional Findings*

Jurisdiction under section 300, subdivision (b)(1), is proper if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [¶] (A) The failure or inability of the child's parent . . . to adequately supervise or protect the child."

The court sustained an allegation that Father's inability to personally care for Destiny placed her at substantial risk of harm. Father does not dispute he was unable to personally care for Destiny but contends the court erred in finding his inability

15

placed Destiny at risk of harm because he could arrange for M.P. to care for Destiny.

"' "In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. 'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' "' " (*In re S.R.* (2020) 48 Cal.App.5th 204, 219.) "' " '[W]hen two or more inferences can reasonably be deduced from the facts,' either deduction will be supported by substantial evidence, and a 'reviewing court is without power to substitute its deductions for those of the trial court.' "' " (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.)

M.P. first proposed that he care for Destiny during a March 21, 2025 phone call with Father and the DI. When M.P. asked Father if he would agree to that, Father said "he would like him to care for Destiny." But less than a week later, M.P. skipped a meeting with DCFS "due to an unexpected change in plans."

When the topic arose again on April 9—the next time DCFS was able to speak to M.P.—M.P. said he was willing to take care of Destiny if that was what Father wanted. The record does not explain why M.P. thought Father's wishes may have changed from what he had previously expressed. M.P. also told the DI he would need time to prepare for Destiny. But although

16

M.P. agreed to speak with Father "within the next couple of days," the record contains no evidence that, in the three weeks between M.P.'s conversation with the DI and the adjudication hearing, M.P. spoke with Father or prepared his home for Destiny.

Moreover, Destiny had never spent time with M.P. There was also an Adult Protective Services report accusing M.P. of fraudulently using Father's money for his own purposes, as well as questions about M.P.'s gang affiliation and why he had a 10-year-old daughter that lived with his mother instead of him.

The care a parent arranges for their child must be suitable, reliable, and appropriate. (See *In re X.D.* (2025) 114 Cal.App.5th 357, 364 [section 300, subdivision (g) provides for jurisdiction if "the child's parent has been incarcerated or institutionalized and cannot arrange for the care of the child"; "the type of care that the parent must be incapable or unable to arrange must be care that is 'suitable,' 'reliable' or 'appropriate' for the child during the period of the parent's incarceration"].) On this record, substantial evidence supports a finding that M.P. was not a suitable, reliable, or appropriate caretaker for Destiny at the time of the adjudication hearing, and therefore Father's inability to personally care for Destiny placed her at substantial risk of harm as he had proposed no other plan for her care.[5]

---

[5] Father's case citations to *In re S.D.* and *In re R.M.* are inapposite. In *S.D.*, after the mother was arrested, one of her sisters traveled from Missouri to testify at the detention hearing to request the child be released to her custody. (*In re S.D.* (2002) 99 Cal.App.4th 1068, 1072–1073.) The social services agency not only released the child to this sister but also later "touted" her as a prospective adoptive parent—the agency self-evidently
*(Fn. is continued on the next page.)*

17

## C. *The Court Did Not Err in Refusing to Release Destiny to Father*

"If a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child.  If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."  (§ 361.2, subd. (a).)

Here, the court expressly found "by clear and convincing evidence that there would be a substantial danger to the physical, health, safety and protection, and well-being of the child, if the child were returned home to" either parent.

Father makes no new arguments about why the court erred.  He reiterates that "for the reasons stated above, Destiny

---

considered the sister to be an appropriate caretaker for the child.  (*Id.* at p. 1071.)  In *R.M.*, after the parents were arrested on murder charges, the father informed DCFS that the paternal grandfather would be willing to care for their child, which information DCFS confirmed.  (*In re R.M.* (2024) 99 Cal.App.5th 240, 243–244.)  Additionally, both the paternal grandmother—living separately from the paternal grandfather—and the maternal grandmother expressed a desire that the child be placed in their custody.  (*Id.* at p. 244.)  At the request of the child's attorney, the court placed him with the paternal grandmother, meaning the court must have found the grandmother to be a suitable caretaker.  (*Id.* at p. 245.)  Here, by contrast, substantial evidence supports a finding that M.P. was both unavailable and unsuitable.

would not have been in substantial danger if placed with [Father].  Nor would placement of Destiny with [Father], under an arranged plan of care, have been detrimental to her."  Father further argues the court could have ordered him to assume custody under court supervision, providing extra protection for Destiny.  But the same evidence discussed in the previous section supports the court's finding here as well.  In other words, substantial evidence supports a finding both that M.P. was unavailable as a caregiver and, in any case, was not suitable, reliable, or appropriate.  Because Father's only plan to care for Destiny was to have M.P. provide that care due to Father's inability to provide care himself, she would have been at substantial risk of harm if released to his custody.[6]

---

[6] Father argues that even if M.P. were unable to care for Destiny, "the record is devoid of any serious inquiry of [Father] as to his thoughts on a plan of care with" MA (with whom Destiny was residing at the time of the adjudication hearing).  Father provides no authority holding a court errs in sustaining a petition against a parent due to his inability to personally care for a child because DCFS failed to ask that parent's opinion about the person currently caring for the child.  In any case, DCFS informed Father on their March 21, 2025 phone call that it had placed Destiny with MA, and it was during that phone call that Father agreed he would like M.P. to care for Destiny.

## DISPOSITION

The court's orders are affirmed.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.